# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-0947

**LESSIE OLIVER HATSFELT**

**VERSUS**

**RONALD VERNON HATSFELT**

************

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT,
PARISH OF ALLEN, NO. C-2003-352,
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE

************

**JIMMIE C. PETERS
JUDGE**

************

Court composed of Jimmie C. Peters, J. David Painter, and James T. Genovese, Judges.

**REVERSED AND RENDERED.**

**Elizabeth A. Dugal
Attorney at Law
Post Office Box 2885
Lafayette, LA  70502-2285
(337) 237-2535
COUNSEL FOR PLAINTIFF/APPELLANT:**
    Lessie Oliver Hatsfelt

**Judi F. Abrusley
Attorney at Law
Post Office Drawer 1114
Oakdale, LA  71463
(318) 335-9771
COUNSEL FOR DEFENDANT/APPELLEE:**
    Ronald Vernon Hatsfelt

PETERS, J.

Lessie Oliver Hatsfelt appeals a portion of the trial court judgment partitioning the community of acquets and gains previously existing between herself and her former husband, Ronald Vernon Hatsfelt, wherein she was ordered to pay her former husband an equalizing payment of $6,925.34. For the following reasons, we reverse that portion of the trial court judgment at issue and render judgment changing the equalizing payment by ordering Ronald Vernon Hatsfelt to pay his former wife the sum of $17,027.70 as an equalizing payment.

## DISCUSSION OF THE RECORD

Lessie Oliver Hatsfelt (Lessie) and Ronald Vernon Hatsfelt (Ronald) were married on October 18, 1966, and separated for the last time in November of 2002. On June 17, 2003, Lessie filed a petition seeking a divorce and other relief. After an August 20, 2003 hearing, the trial court rendered judgment granting Lessie a divorce, partially allocating the use of certain community properties and the payment of certain community obligations, and enjoining either party "from alienating, encumbering, mortgaging or otherwise disposing of the community property." The trial court reduced this judgment to writing on October 16, 2003.

After the divorce judgment, and after Lessie filed a number of other pleadings addressing discovery issues, Ronald filed a petition to judicially partition the community of acquets and gains. The trial court conducted a three-day trial addressing the partition issues beginning October 26, 2004, and, after completion of the evidence, took the issues under advisement. On February 7, 2005, the trial court issued written reasons for judgment wherein it assigned the various assets and liabilities to the individual parties and reconciled the assignments by ordering that

Lessie pay Ronald an equalizing payment of $10,725.34. On the same day, the trial court signed a judgment incorporating its written reasons for judgment.

Lessie then filed a motion for new trial, which the trial court granted for the purpose of reargument only. After the April 19, 2005 hearing on the motion, the trial court issued additional reasons for judgment and a new judgment which, among other things, reduced Lessie's equalizing payment to $6,925.34. In her sole assignment of error on appeal, Lessie asserts that the trial court erred in requiring her to pay an equalizing payment because it erred in awarding Ronald reimbursement for certain post-community debts described as follows:[1]

1. A $4,000.00 obligation to Bruce Jones as evidenced by a promissory note executed by Ronald in that amount, dated September 3, 2003, and made payable to Bruce Jones. (Balance awarded—$4,000.00.)

2. A $15,000.00 obligation to Ronald Shelton Hatsfelt, Ronald's son, as evidenced by a promissory note executed by Ronald in that amount, dated November 3, 2003, and made payable to Ronald Shelton Hatsfelt. (Balance awarded—$13,444.00.)

3. A $7,000.00 obligation to Rush Mortgage Investment Company (Rush Mortgage) as evidenced by a promissory note executed by Ronald in that amount, dated May 26, 2004, and made payable to Rush Mortgage. (Balance awarded—$6,462.08.)

4. A $7,000.00 obligation to MBNA Platinum Plus MasterCard (MBNA MasterCard) as evidenced by a cash withdrawal by Ronald on the MBNA MasterCard in that amount on September 13, 2004. (Balance awarded—$7,000.00.)

5. A $7,000.00 obligation to Chase Platinum MasterCard (Chase MasterCard) as evidenced by a cash withdrawal by Ronald on the Chase MasterCard in that amount on September 14, 2004. (Balance awarded—$7,000.00.)

---

[1] In her appellate brief and at oral argument, Lessie brought up other issues involving pre-community termination issues. However, she did not assign these as assignments of error and we will not consider them.

6. A February 4, 2004 written agreement by Ronald to pay Judi Abrusley, attorney at law, $5,000.00 for legal representation in a dispute over parish sales tax. (Balance awarded—$5,000.00.)

7. A January 7, 2004 written agreement by Ronald to pay Judi Abrusley, attorney at law, $5,000.00 for legal representation in defending him in a civil tort matter. (Balance awarded—$5,000.00.)

The post-separation operation of a family restaurant gave rise to the reimbursement issues set forth above. The evidentiary record establishes that, for over ten years before their separation, Lessie and Ronald owned and operated a restaurant in Oakdale, Louisiana. In September of 1999, they changed restaurant locations when the Hardwood Mill Restaurant located on Louisiana Highway 10 became available for purchase. Prior to that time, they operated a restaurant on U.S. Highway 165. Although Lessie worked in both restaurants from time to time, Ronald ran the day-to-day operation, and, when the parties separated, he continued its operation. Lessie did not work in the restaurant at all after their November 2002 separation.

Lessie testified at trial that she was not aware of any debts on the restaurant when she and Ronald separated and that, prior to the separation, their financial obligations were current. Additionally, she testified that, before the separation, the restaurant operating expenses and some personal travel expenses were paid from the restaurant checking account, but all personal financial obligations, with the exception of some household supplies and groceries supplied through the restaurant, were paid separate from the restaurant. Ronald did not dispute her testimony in this regard, but testified that he changed the procedure after the parties separated and began paying everything, business and personal, through the restaurant account.

3

The five loans at issue total $40,000.00, and they as well as the $10,000.00 attorney fees commitment were all consummated between September 3, 2003, and September 14, 2004, or within a period of slightly over one year. Ronald testified that he deposited the $40,000.00 into the restaurant operating account and used it to pay restaurant obligations. Concerning the attorney representation, Ronald testified that it was necessary to protect the restaurant business in two separate legal matters. However, at trial, he had yet to pay anything on the attorney fee obligations.

In support of his testimony with regard to the loans, Ronald offered the following documentary evidence:

1.      Bruce Jones $4,000.00 obligation—A copy of the promissory note and a copy of a $4,000.00 check both dated September 3, 2003, drawn on the account of Cotton's Heating & Cooling, and made payable to Ronnie Hatfelt; and a copy of a deposit slip from First Federal Savings and Loan Association (First Federal) dated September 8, 2003, purporting to include the $4,000.00 as a part of a deposit into the restaurant operating account.

2.      Ronald Shelton Hatsfelt $15,000.00 obligation—A copy of the promissory note dated November 3, 2003; a copy of a $15,000.00 United States Treasury check dated October 30, 2003, made payable to Ronald Hatsfelt; and a copy of a deposit slip from First Federal dated November 3, 2003, purporting to include the $15,000.00 as a part of a deposit into the restaurant operating account.

3.      Rush Mortgage $7,000.00 obligation—A copy of the promissory note (described as a promissory note, truth-in-lending disclosure statement, and security agreement); a copy of a $7,000.00 check dated May 26, 2004, drawn on the account of Rush Mortgage and made payable to Ronnie Hatsfelt; and a copy of a deposit slip from First Federal dated June 1, 2004, purporting to include the $7,000.00 as a part of a deposit into the restaurant operating account. The promissory note lists two recliners, a 46-inch RCA big screen television, an RCA satellite system, and a satellite dish as security for the transaction.

4

4.   Copy of a MBNA MasterCard statement bearing a September 22, 2004 closing date which reflects a $7,000.00 cash debit to the account on September 16, 2004.[2]

5.   Copy of a Chase MasterCard statement bearing a September 23, 2004 closing date which reflects a $7,000.00 cash debit to the account on September 14, 2004, and a copy of a deposit slip from First Federal dated September 13, 2004, purporting to include the $7,000.00 as a part of a deposit into the restaurant operating account.

In support of his testimony with regard to the attorney fees, Ronald offered the following documentary evidence:

1.   Copy of an attorney/client contract of employment dated January 7, 2004, wherein Ronald agreed to retain Judi F. Abrusley, attorney at law, to represent the restaurant in litigation involving a tort claim against the restaurant. The contract provides that Ronald agreed to pay the attorney $5,000.00 as a non-refundable initial fee and agreed to do so "prior to the commencement of trial."

2.   Copy of an attorney/client contract of employment dated February 4, 2004, wherein Ronald agreed to retain Judi F. Abrusley, attorney at law, to represent the restaurant in litigation involving Allen Parish sales and use tax. The contract provides that Ronald agreed to pay the attorney $5,000.00 as a non-refundable initial fee.

In her appeal, Lessie asserts that the trial court erred in classifying these obligations as community debts because Ronald failed to prove by a preponderance of the evidence that these debts were even incurred. Additionally, even assuming their existence, Lessie asserts that they should not have been credited to the community because they were incurred after dissolution of the community of acquets and gains and were incurred in violation of the temporary restraining order issued by the trial court.

---

[2]Ronald's brief suggests that the record also contains the corresponding deposit slip from First Federal Savings and Loan Association purporting to show that the funds were deposited into the restaurant account. However, our review of the record does not reveal that deposit slip.

**OPINION**

The community of acquets and gains previously existing between Lessie and Ronald terminated on June 17, 2003, the day Lessie filed her petition for divorce. *See* La.Civ.Code art. 159. Thus, the transactions at issue were not community transactions, and the trial court erred in classifying them as such. However, the fact that the debts at issue arose after termination of the community of acquets and gains does not automatically disqualify Ronald from seeking reimbursement of one-half of the amounts if they were incurred while fulfilling his duty under La.Civ.Code art. 2369.3 to preserve the former community property under his control. That Article provides:

> A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.
>
> A community enterprise is a business that is not a legal entity.

Additionally, this court noted in *Kline v. Kline*, 98-1206, p. 5 (La.App. 3 Cir. 2/10/99), 741 So.2d 670, 673:

> The comments to Article 2369.3 explain that unlike ordinary co-owners, this article imposes a higher and affirmative duty of care for the management of former community property since the presumption that a spouse will act in the best interest of the community no longer exists. Additionally, Comment (f) recognizes the entitlement that La.Civ.Code art. 806 grants, to-wit: "[a] spouse who incurs expenses in compliance with the obligation imposed by this Article is entitled [to] reimbursement for one-half the costs in accordance with general principles of the law of co-ownership." Article 806 provides, in pertinent part, the following:
>
>> A co-owner who on account of the thing held in indivision has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to

6

reimbursement from the other co-owners in proportion to their shares.

Thus, as a co-owner in possession and control of the former community property, Ronald was burdened with the duty to prudently preserve and manage the restaurant operation and was entitled to reimbursement for one-half of any expenditures made in compliance with that duty.

With regard to the five loans at issue, Ronald offered the exhibits previously described and testified that he used the funds to pay various restaurant debts.[3] He did not specify which debts were paid by the first two loans, but suggested that the Rush Mortgage loan was used to pay for past-due rent in the amount of $6,000.00 and that the remaining $1,000.00 was used to pay other undisclosed restaurant expenses. The two credit card withdrawals, according to Ronald, were used to pay past-due light and water bills.

Although the evidence does establish that Ronald deposited the proceeds of those loans into the restaurant's operating account, we find that the evidence is woefully inadequate to establish that Ronald used the proceeds to pay any particular restaurant obligation. In fact, his testimony with regard to the ultimate use of the money is self-serving, unsupported by the record, and totally inconsistent with his own filings.

After he assumed sole operation of the restaurant and began paying all of his personal bills from the restaurant account, Ronald ceased keeping the cash register receipts as a record of the actual daily income and began taking cash from the

---

[3]Although he presented no records to support his testimony, Ronald testified that the restaurant debts paid by the loan proceeds included at various times rent ($1,500.00 per month), electricity ($1,400.00 to $1,900.00 per month), gas and water ($600.00 to $700.00 per month), food and supplies ($2,200.00 per week), and telephone ($237.00 per month).

7

restaurant proceeds on a regular basis. These acts made it impossible for anyone to trace the restaurant income with any degree of accuracy. Kimberly Gardener, a Lafayette, Louisiana certified public accountant who was retained by Lessie to place a value on the restaurant, testified that when she examined Ronald's 2003 tax return,[4] she could not reconcile it with the bank statements provided to her and found the supporting records to be totally inadequate and inconsistent. When questioned at trial about the discrepancies in the records and the lack of records in general, Ronald simply stated that he was not very good at keeping records. In fact, Ronald acknowledged at trial that he had no evidence to establish which restaurant debts were paid by the loans.

Ronald used basically the same logic in failing to respond to Lessie's discovery requests. On June 26, 2003, Lessie began propounding discovery requests in the form of interrogatories and requests for production to Ronald, seeking to obtain information with regard to the operation of the restaurant. These were followed with additional requests in both November and December of 2003, and Ronald either partially complied with or ignored completely the discovery requests. When questioned concerning certain requested bank records which he did not provide in response to discovery, he simply responded that he did not believe he had to produce them. Ronald took the same attitude with regard to the October 16, 2003 judgment enjoining him from mortgaging the community property as he used community property as security for the Rush Mortgage loan.[5]

---

[4]Ms. Gardener also examined the couple's tax returns from 1998 through 2002, but the 2003 return was the first individual return filed by Ronald after the separation.

[5]The loan document lists two recliners, a 46- inch television, a satellite system, and a satellite dish as security for the loan. These items are listed on both Ronald's and Lessie's detailed descriptive lists as community property.

Despite Ronald's inability to document the monthly expenses of the restaurant and the debts paid by the five loans, he had no difficulty in identifying the community assets. On June 15, 2004, or the day before he filed his petition to have the community property partitioned, Ronald executed an eleven-page detailed descriptive list purporting to identify all of the assets and liabilities of the community.[6] In that detailed descriptive list, he identified three pieces of immovable property and 137 items of movable property as belonging to the community. Additionally, he identified over twenty community debts, three additional items for which he sought reimbursement, and five other items for which either he or Lessie were seeking reimbursement and which were disputed. Notably, he did not mention any of the first three loans in the detailed descriptive list despite the fact that the Rush Mortgage transaction had occurred less than thirty days before.[7]

An appellate court's review of factual findings of the trial court is governed by the manifest error/clearly wrong standard. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). "[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Id.* at 844. In this case, we do find that the trial court was manifestly erroneous in accepting Ronald's unsupported testimony with regard to the payment of restaurant debts, particularly where Ronald failed to establish the debts purportedly paid. In reaching this conclusion, we are not unmindful of La.Civ.Code art. 1846, which requires proof "by at least one witness *and* other corroborating circumstances" when

_____

[6]Ronald filed this detailed descriptive list on August 5, 2004.

[7]An expense affidavit executed by Ronald on October 18, 2004, or eight days before trial, represents the first indication in the record that the loans and attorney fees were the subject of reimbursement issues.

9

the obligation at issue exceeds $500.00. (Emphasis added.) While Ronald did not specify which restaurant obligations were paid, he implied that all or most were in excess of $500.00. As we pointed out in *Sheridon v. Sheridon*, 03-103, p. 12 (La.App. 3 Cir. 2/4/04), 867 So.2d 38, 47, when the debt exceeds $500.00, "[t]he issue is not one of credibility, but of sufficiency of the evidence." Given the record before us, we find merit in Lessie's assignment of error with regard to the loans at issue and reverse the allocation of one-half of these obligations to her and allocate all to Ronald.

Turning to the attorney fees at issue, we find that the trial court erred in awarding Ronald reimbursement for those amounts as well. As previously stated, La.Civ.Code art. 2369.3 requires that Ronald preserve and manage the restaurant as a prudent manager, "in a manner consistent with the mode of use of that property immediately prior to termination of the community regime." If he fails in that regard, he is answerable to Lessie for any damage caused thereby.

Again, the record does not contain sufficient evidence to reconstruct the legal issues at hand or to determine the current status of either. While the sales tax issue seems to have arisen before the final separation in November of 2002, Ronald failed to preserve the records necessary to resolve the issue. Even after Ronald was instructed by the agency conducting the audit of the business to maintain certain records, he failed to comply. Additionally, with regard to the alleged tort suit, Ronald presented no evidence to establish when the act giving rise to the litigation occurred or when the restaurant ceased to be covered for liability purposes. That is to say, the record contains no evidence to suggest that the restaurant was operated without liability insurance protection prior to the termination of the community. Given

Ronald's failure to maintain the appropriate records from which an accurate audit could be performed, and given the lack of evidence concerning the specifics of the tort suit, we cannot conclude that Ronald fulfilled his obligation mandated by La.Civ.Code art. 2369.3, and he should not be allowed to profit from his failure.

## DISPOSITION

For the foregoing reasons, we reverse the trial court's determination that Ronald Vernon Hatsfelt should be reimbursed one-half of the amounts at issue, or $23,953.04. In reversing the trial court in this regard, we amend the trial court judgment to delete the requirement that Lessie Oliver Hatsfelt pay her former husband an equalizing payment of $6,925.34 and order that Ronald Vernon Hatsfelt pay Lessie Oliver Hatsfelt an equalizing payment of $17,027.70. We assess all costs of this appeal to Ronald Vernon Hatsfelt.

**REVERSED AND RENDERED.**