# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 06-1615

CLORADEAN PREJEAN GRANGER

VERSUS

WALLACE ANTHONY GRANGER

**************

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, DOCKET NO. 94-C-1479-B
HONORABLE ELLIS J. DAIGLE, DISTRICT JUDGE

**************

**SYLVIA R. COOKS**
**JUDGE**
**************

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and James T. Genovese, Judges.

Genovese, J., concurs in part, dissents in part, and assigns written reasons.

**AFFIRMED.**

J.N. Prather, Jr.
P.O. Box 3993
1000 Lafayette Street
Lafayette, LA 70502
(337) 237-0047
COUNSEL FOR PLAINTIFF/APPELLEE:
      Cloradean Prejean Granger

Henry C. Perret, Jr.
Kyle M. Bacon
Perret Doise, APLC
600 Jefferson Street, Suite 1600
Post Office Drawer 3408
Lafayette, LA 70502-3408
(337) 261-9000
COUNSEL FOR DEFENDANT/APPELLANT:
      Wallace Anthony Granger

**Harry T. Lemmon**
**650 Poydras Street**
**New Orleans, LA 70130**
**(504) 581-2155**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Wallace Anthony Granger**

**Anne Elizabeth Watson**
**Dupre & Watson**
**232 North Liberty Street**
**Opelousas, LA 70570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Wallace Anthony Granger**

**COOKS, Judge.**

## STATEMENT OF THE CASE

Wallace Anthony Granger appeals the decision of the trial court awarding his former spouse, Cloradean, the sum of $400,000 as her share in a closely held corporation. For the reasons assigned below, we affirm the decision of the trial court.

## STATEMENT OF THE FACTS

Wallace and Cloradean Granger were married in 1981 and have two children. Shortly after their marriage, the couple formed Technical Tubular Inspection Services, Inc. (Technical Tubular), an oilfield pipe inspection company. Wallace and Cloradean were the sole shareholders. Wallace solicited business for the company and ran the daily operations. Cloradean managed the office, paid the bills and the payroll. Both their home and business were located on property off of Superior Road in Churchpoint. Although the couple struggled financially in the early years, through the industry of both parties, the business grew and prospered during the fourteen years of their marriage. By 1993, the last full year of the existence of the community, income tax returns indicate the gross income for Technical Tubular totaled approximately $918,000.

In April 1994, Cloradean filed a petition for divorce and requested that the community property be divided. Judgment of divorce was rendered in March 1995. The community assets, except for the parties' interest in Technical Tubular, was partitioned.

In the interim, from April 1994 to March 1995, Wallace was in control of Technical Tubular. The corporation's gross income for 1994 dropped. In January 1995, in an effort to prevent the downward spiral of the business, Cloradean filed a request to be appointed temporary receiver. The corporation's income continued to

1

decline and by June 1995 Technical Tubular was showing sales of only $103,538.

On March 3, 1995, immediately following the judgment of divorce, on the day Cloradean was appointed receiver, Wallace walked away from the business and formed a new corporation, Tube-Tech. Tube-Tech was staffed by former employees of Technical Tubular, retained former clients of the community business and used a similar name and logo. Cloradean eventually filed for bankruptcy on behalf of Technical Tubular.

Trial on the partition of Technical Tubular was held in January 2006. The trial court found as of the date of trial, the stock in Technical Tubular was worthless. The trial court further held:

> Wallace depleted Technical Tubular of its employees and customers. He started a new corporation with a deceptively similar name and logo. He did all of this only days after the judgment was rendered appointing Cloradean temporary receiver of Technical Tubular. Tube-Tech did not exist until March 9, 1995, six (6) days after Cloradean was appointed receiver of Technical Tubular, and Wallace was ordered not to dispose of any property of Technical Tubular, nor to change the status of the affairs of Technical Tubular to the injury of Cloradean. Wallace Granger did exactly that which the March 3, 1995 Judgment ordered him not to do!

> The evidence established that both parties used corporate assets for personal use; however, Wallace abused these assets while in control of Technical Tubular after the termination of the community property regime (April 19, 1994) and until Cloradean was appointed receiver on March 3, 1995. Wallace's abuse of the assets was the reason for which she filed to be appointed receiver.
> . . . .
> Wallace was ordered not to dispose of any property of Technical Tubular, Inc. Instead of following the court's order, he did the polar opposite. He maneuvered the employees and customers of Technical Tubular into Tube-Tech, leaving Technical Tubular with only the debts. Within approximately three (3) months, Cloradean was forced to bankrupt Technical Tubular.
> . . . .
> In following the ruling of *Queenan,* this court finds that Cloradean and Wallace own a one-half (½) interest each of the value of the stock in Tube-Tech as it is a substitute corporation for Technical Tubular due to Wallace's action in taking all of the customers and employees of Technical Tubular and placing them in Tube-Tech as a

2

direct violation of the court order of the 19th Judicial District Court enjoining Wallace "from disposing of any property of Technical Tubular Inspection Services, Inc., or from changing the status of the affairs of Technical Tubular Inspection Services, Inc. to the injury of mover."

The parties stipulated that the value of Tube-Tech, the new corporation, on the date of trial was $800,000. The trial court awarded Cloradean the sum of $400,000. Wallace appeals asserting numerous assignments of error. We affirm the judgment of the trial court.

## LAW AND DISCUSSION

The trial court relied on this court's case of *Queenan v. Queenan*, 492 So.2d 902 (La.App. 3 Cir.), *writ denied*, 496 So.2d 1045 (La.1986). In *Queenan*, Michael and Penny Queenan owned stock in three closely held corporations which were begun during their marriage. After the termination of the community, Michael continued to manage the companies. He then formed a new corporation in which he was the sole stockholder. Michael operated the new corporation out of the same office along with the family businesses. By comparing the book value of the two corporations, it was apparent the new corporation, owned solely by Michael, flourished and prospered at the expense of the family owned business. This court concluded Michael, as the spouse in control of the former community asset, "breached the fiduciary obligations owed Penny Queenan . . . under the partnership and corporate laws of the State of Louisiana." *Queenan,* 492 So.2d at 911. In order to determine the amount owed to Penny, the court characterized the corporation, though technically Michael's separate property, as part of the community and therefore subject to partition. This court articulated the responsibility of the spouse in control of former community property, as follows:

> [F]ollowing the judicial termination of a community regime and before a property settlement of the community assets has been consummated, a former spouse having control and possession of any assets belonging

3

to the community regime would owe a fiduciary obligation to the former spouse who is not in control or possession.

Until there is a community property settlement, there exists a practical or empirical extention of the community regime insofar as the duties and obligations of the former spouses relate to each other in the management of the community assets. The parties are not only co-owners but are the beneficiaries as well as obligors of a technical or legal extention of the community regime until settlement thereof, thus acquiring a peculiar relationship as a specie of partners, co-owners, and as in the case sub judice co-owners of shares of stock and/or common owners of shares of stock in a family owned corporation or corporations. The relationship of spouses and former spouses (until there has been a property settlement following termination of the community regime) cuts through the entirety of the law, including the laws of partnership, property, and corporations.

*Id*. at 912.

The Queenan court characterized the parties' legal relationship as "not only co-owners but . . . beneficiaries as well as obligors of a technical or legal extention of the community regime until settlement." *Id.* at 912. Wallace contends *Queenan* is an anomaly in the law and its holding has been criticized by legal scholars. However, the underlying rationale in *Queenan* for imposing a fiduciary duty on a spouse having control of the former community asset is based on a recognition that after the termination of the community the spouse in control will not necessarily act in the best interest of the other party. This rationale is still valid and rather than being discredited, the legislature in 1995, changed the law to impose a higher standard of care on the spouse in control of the former community than had previously been required.[1] This change in the law is an affirmation rather than a repudiation of the *Queenan* decision.

Louisiana Civil Code Article 2369.3 clearly defines the duty of the spouse in control of the former community asset and provides, in relevant part:

---

[1] The effective date of La.Civ.Code art. 2369.3 is after the date of the filing of the petition in the present appeal.

A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default or neglect.

Comment (a) under this statute explains:

This Article changes the law. First, it imposes on a spouse who has control of former community property an affirmative duty to "preserve and to manage" such property. In contrast, Civil Code Article 800 (rev. 1990), applicable to ordinary co-owners, provides for a right but not a duty to act for the preservation of the property. Such a duty arises only if the co-owner undertakes to act as a *negotiorum gestor* or he is appointed administrator. See Symeonides & Martin, The New Law of Co-ownership: A Kommentar, 68 Tul. L. Rev. 701, 746 (1993). Similarly, the co-ownership articles of the Civil Code do not impose on one co-owner an affirmative duty to manage the co-owned thing unless that owner assumed the qualities of a *gestor* or was appointed as an administrator. See C.C. Arts. 801, 803 (rev. 1990); Symeonides & Martin, supra at 738-748. Second this Article imposes a higher standard of care than that provided by Civil Code Article 799 (rev. 1990) for ordinary co-owners. See comment (g), *infra*.

*This Article also imposes a higher standard of care in managing and maintaining such former community property than the standard imposed during the marriage for managing community property. See C.C. Art. 2354 (rev. 1979). The reason for imposing a higher standard of care in managing former community property is that, after termination of the community property regime, the law no longer assumes that a spouse who has former community property under his control will act in the best interest of both spouses in managing it.* (Emphasis added).

Louisiana Civil Code Article 159 provides the "judgment of divorce terminates a community property regime retroactively to the date of filing of the petition in the action in which the judgment of divorce is rendered." Cloradean filed the petition for divorce in April 1994. Therefore, the couple's community property regime terminated on that date. *See Hatsfelt v. Hatsfelt*, 05-0947 (La.App. 3 Cir. 2/1/06), 922 So.2d 732. Wallace was in control of Technical Tubular from this date until March 1995. We have reviewed the testimony and documents presented by both parties and find no error in the finding of the trial court that Wallace allowed Technical Tubular

to decline in value in the interim period between the petition for divorce and the final divorce decree. He essentially admitted such in his testimony. Wallace testified he stopped working the business. "[I] didn't work for the last five or six months with that company. I just stayed home just like she did." No one was running Technical Tubular, but the monthly corporate overhead of $36,000 continued to accumulate. Wallace still collected his salary and used funds in the corporate account and began "factoring" company invoices to pay for his personal expenses. When Cloradean obtained control of the company in March 1995, the accounts receivable were down to $5,000 and the debts exceeded $200,000. Just days after the divorce was final, Wallace began Tube-Tech, an identical company with the same employees and customers as the old business. While Wallace's income never suffered, Cloradean was left with a worthless company. Wallace focused his energy and skill on the new company, which he solely owned, and allowed Technical Tubular to decline.

The trial court found Cloradean's testimony more credible than Wallace's. We find no error in this assessment by the trial court. Once the petition for divorce was filed, Wallace began planning the new company and began to lure employees and customers to the new business. Although Wallace testified after the divorce he was left destitute with nothing but a "few old tools," Wallace's actions as well as the financial evidence introduced by Cloradean contradicted his testimony. Wallace incorporated Tube-Tech just days after Cloradean was appointed receiver of Technical Tubular. Interestingly, Tube-Tech was not incorporated in Wallace's name, it was incorporated in his friend, Paul Diaz's name. Wallace explained the company was set up in Diaz's name because Diaz loaned him money for start-up costs. Six months after the divorce, Diaz was paid in full although transfer of the company into Wallace's name did not take place until two years later. Wallace denied any attempt

6

at deception. Wallace admitted he acquired all of the former employees of Technical Tubular and employed them in the same capacity as the old corporation. Likewise, Wallace testified he was calling on the same customers with his new corporation. The employees continued to report everyday to the same location of the former corporation because Tube-Tech was located in virtually the same location as Technical Tubular. The testimony supports a finding that Wallace allowed Technical Tubular to decline to the detriment of Cloradean.

Cloradean testified Wallace completely surprised her when he walked away from the business: "I didn't know where I was going with that because I had not expected Wallace to just bail out." In an attempt to prevent the total decline of the business, Cloradean petitioned to be appointed receiver. Although she acquired control at the time of the judgment of divorce, the employees were gone, the customers were gone, and she was left with nothing but debts. It took her sixty days to determine the financial condition of the company. She found unpaid bills and taxes which were months behind. "And once it was all said and done, Technical Tubular was in debt of over $200,000– something, including the IRS and all kinds of notes payable." She discovered "Wallace went out and bought a Corvette that Technical Tubular paid for, but he made sure that the truck – the car was put under his name personally, but the company paid the debt." By March 1995, Cloradean stated, "there was nothing to run. There was nothing left to run. . . . I got a company that was knee deep in debt. I had no money to operate with. Private Capital was taking just about everything that was coming in. There was virtually nothing left to pay the debts. . . And I had to start selling assets to be able to start taking care of the debts that he incurred, not I." She discovered Wallace had gone through all the corporate money, " paying all his expenses, not paying payroll taxes, not taking care

7

of the debts of the corporation. . . . I knew I was going to be liable for the IRS. You can't get away from the taxes." In June 1995, Cloradean reluctantly filed for bankruptcy. We find the evidence supports a finding that Wallace allowed a thriving corporation, built over the course of fourteen years, to fail to the detriment of his former spouse.

Wallace contends the trial court erred in using the value of Tube-Tech to determine the amount owed to Cloradean. He asserts Tube-Tech was his separate property and the value of Technical Tubular at the time of trial should have been used by the trial court. As stated by the trial court, the value of Technical Tubular at the time of trial was zero. Cloradean had already placed the company in bankruptcy and all available funds were used to pay off debts incurred by Wallace during the interim period prior to divorce. In allocating community funds, the trial court is given broad discretion and is not "frozen by any statutory time level or particular valuation at any particular time or for any particular purpose," but is charged with placing "values on the assets for the purposes of accounting, allocation, and adjudication in accordance with the further provisions of R.S. 9:2801(4)(b, c, d and e)." *Queenan,* 492 So.2d at 914. The assets of Technical Tubular during the last full year of the community and the stipulated value of the new company, Tube-Tech, were approximately the same value. We find no error in the decision of the trial court awarding Cloradean one-half of the value of Tube-Tech as her share in the community owned business.

*Derivative Action*

Wallace characterized Cloradean as a "shareholder" and contends the trial court "ignore[d] corporate formalities and allowed a shareholder to bring a corporate claim other than through a derivative action." This is a suit to partition community property. Technical Tubular was, for all practical purposes, a community owned

corporation; the corporation's only shareholders were Wallace and Cloradean. We find no merit in this argument.

*Abandonment*

Wallace contends Cloradean's claim for partition of the community owned company has been abandoned. We disagree. Cloradean filed a petition for divorce in April 1994 and petitioned to have the community property divided. In November 1995, the trial court rendered a partial judgment of partition dividing the community property except the parties' interest in Technical Tubular. The order stated "that the only other community asset, Technical Tubular, Inc., and its holdings shall be partitioned at a later date." Prior to this order, Cloradean was appointed receiver of Technical Tubular and filed for bankruptcy. In August 1999, when the bankruptcy proceedings were complete, Cloradean filed a motion to fix the partition for trial. The trial court found the "actions of Wallace in continuing to litigate this matter subsequent to any tolling of the period necessary for abandonment is a waiver of his right to now seek abandonment of Cloradean's claim." We agree with the trial court that Cloradean did not lose her right to partition her interest in Technical Tubular. A co-owner's right to partition a thing held in common is an incident of ownership and is absolute. La.Civ.Code art. 807; *Harris v. Harris*, 29,084 (La.App. 2 Cir. (1/22/97), 687 So.2d 673. We find no merit to this argument.

## DECREE

Based on the foregoing review of the record, we affirm the decision of the trial court. All costs of this appeal are assessed against Wallace Anthony Granger.

**AFFIRMED.**

9

CLORADEAN PREJEAN GRANGER

VERSUS

WALLACE ANTHONY GRANGER

**GENOVESE, J., concurs in part and dissents in part.**

I concur in part and dissent in part in the majority opinion. I agree and concur that, upon their separation and post divorce, Mr. Granger had a fiduciary duty as the spouse in control of a former community asset to act as a prudent administrator and is answerable for damages caused by his fault or neglect. However, I disagree and dissent from the majority opinion as to the amount ($400,000.00) awarded to Ms. Granger. I strongly disagree with the trial court's valuation of damages awarded to Ms. Granger. The trial court simply labeled the new corporation a "substitute corporation" and awarded Ms. Granger one-half of its book value at the time of trial.

As Mr. Granger did little or nothing after their separation to preserve and protect the former community corporation, Ms. Granger did absolutely nothing for eleven years (from 1995 to the 2006 trial date) in the new (substitute) and separate corporation. In the former community corporation, Ms. Granger was an active participant. While Mr. Granger solicited business for the former community corporation, Ms. Granger managed the office, paid the bills, and handled payroll. Together, they worked hard to make the former community corporation a success. They were a team. The record indicates that both were responsible for the growth and prosperity of the former community corporation during the fourteen years of their marriage.

Such was not the case in the "substitute" corporation. Ms. Granger did nothing. Mr. Granger started the new corporation (separate property) after the divorce. Certainly, he used and had the benefit of the former community corporation to further his agenda for which he is accountable to Ms. Granger. However, based on the record, there is no legal or other authority for simply awarding Ms. Granger the full book value of the substitute corporation some eleven years down the road. Most pertinent is the fact that the former corporation and the new corporation are not one and the same and cannot be deemed identical insofar as they performed <u>different</u> operations and services. The former community corporation's business was pipe inspections. The new corporation does pipe inspections; however, <u>a majority of its business is other services</u>. That is not factored into Ms. Granger's award. Mr. Granger gets no credit for the enhancement and expansion of the business.

Had there been no matrimonial strife and discord, and had they continued down the primrose path with the former community corporation, Mr. Granger would have had the benefit of Ms. Granger's hard work as a manager of said corporation for over eleven years. Instead, Mr. Granger was without her services and involvement and still has to pay the full fifty percent book value of the new corporation without credit for enhancement and expansion of the business. What if Mr. Granger would have simply walked away from the business and sought employment elsewhere in April of 1994 when Ms. Granger filed for divorce? What if the new (substitute) corporation had only a $200,000.00 book value? Would Ms. Granger only be entitled to fifty percent of that figure? What if, despite Mr. Granger's efforts, the new corporation became insolvent after or during the eleven years of operation? Would Ms. Granger get nothing?

Though I agree that Ms. Granger is entitled to an award for Mr. Granger's fault

and neglect vis-a-vis the former community corporation, I find that neither the record nor the law supports the trial court's arbitrary $400,000.00 award in favor of Ms. Granger and would reduce same.

For the foregoing reasons, I concur in part and dissent in part in the majority opinion in this case.